BRYAN T. DAKE
Assistant U.S. Attorney
U.S. Attorney's Office
James F. Battin Courthouse
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Phone:      406-657-6101
Fax:        406-657-6058
Email:      Bryan.Dake@usdoj.gov

JEREMY M. P. GOLDSTEIN
Trial Attorney
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue, Room 10-0101
San Francisco, CA 94102
Phone:      415-229-2934
Fax:        415-934-5399
Email:      Jeremy.Goldstein@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| UNITED STATES OF AMERICA, | CR 22-113-BLG-SPW |
|---|---|
| Plaintiff, | |
| vs. | SENTENCING MEMORANDUM |
| NATHAN NEPHI ZITO, | |
| Defendant. | |

1

## INTRODUCTION

The defendant, Nathan Nephi Zito, has bid on highway construction and repair projects for over twenty years. As Mr. Zito knows, those projects are awarded through a competitive bidding process that identifies the lowest responsible bidder and helps guarantee that taxpayer money is spent responsibly, transparently, and fairly.

Not content to compete on the merits, however, Mr. Zito attempted to cheat the competitive bidding process. He pressed a competitor to divide among their companies two local markets for highway crack sealing projects and, in the process, to cease competing against Mr. Zito in Mr. Zito's core markets. Mr. Zito then attempted to disguise the purpose and effect of his conduct by crafting a sham transaction to provide perceived legal cover. He has entered into or tried to enter into similar deals with other companies in the past. Had Mr. Zito's conduct been successful, there would have been a dangerous probability that he would have eliminated competition and been free to raise prices or limit output.

The defendant's actions here are inexcusable. As the Sentencing Guidelines recognize, "there is near universal agreement that restrictive agreements among competitors," like the agreement Mr. Zito proposed, "can cause serious economic harm" and "serve no purpose other than to restrict output and raise prices." *See*

2

USSG § 2R1.1, Background. A sentence of imprisonment within the guideline range, followed by a term of supervised release, holds him accountable for his conduct and provides a strong deterrent to the defendant and to others who may seek to cheat the state's competitive bidding process for their own personal gain.

## FACTS

Mr. Zito is the former owner and president of a paving and asphalt company headquartered in Billings, Montana. Presentence Investigation Report ("PSR") at ¶ 7. In January 2020, he contacted the owner of a competing paving and asphalt company based in Sioux Falls, South Dakota, to propose a "strategic partnership." *Id.* ¶¶ 7-8. The two companies frequently competed for the same publicly funded highway crack sealing projects administered by the Wyoming Department of Transportation, the South Dakota Department of Transportation, and neighboring state departments of transportation. *Id.* ¶ 7. In many instances, they were the only two companies that submit bids for these types of projects in Wyoming. *See id.*

After he was contacted by Mr. Zito, the competitor immediately reported Mr. Zito's outreach to the Federal Highway Administration, which then notified the Department of Transportation Office of Inspector General ("DOT OIG"). *Id.* ¶ 8. DOT OIG recorded over a dozen phone calls between Mr. Zito and the

competitor as Mr. Zito persisted—over many calls—to convince his competitor to strike a deal. *Id.* ¶¶ 8-11.

Over the course of those calls, the defendant proposed that the companies allocate markets for publicly funded crack sealing projects. *Id.* ¶¶ 8-9. Under the terms of the agreement, which the defendant laid out in a June 16, 2020 call: (1) the competitor would cease bidding for federal, state, and local crack sealing projects in Wyoming and Montana, essentially ceding those two states to the defendant's company; (2) in return, the defendant would cease bidding for federal, state, and local crack sealing projects in South Dakota and Nebraska; and (3) the defendant would pay the competitor $100,000 as compensation for his lost business in Wyoming and Montana. *Id.* ¶ 11.

The defendant was clear that he intended to significantly reduce competition for crack sealing projects in Montana and Wyoming. For instance, in one call, after the competitor asked the defendant if he was "looking for certain territories or certain areas so it limits the competition," the defendant responded, "my biggest thing is, you know, if we weren't fighting over Wyoming the margins would go up to a much more livable wage, you know, livable number." *Id.* ¶ 9.

In another call, the defendant explained that he was looking to expand his business in Montana and elsewhere, but "want[ed] to do it in a way that we get

4

along because I really feel like you guys are the only ones that can compete with us. . . . There's not very many companies that can put the kind of asphalt we can put down. So I guess I would much rather get along with you guys in particular and come to some agreement than butt heads." *Id.* ¶ 10.

After proposing the agreement, Mr. Zito attempted to disguise the purpose and effect of the market allocation agreement. *Id.* ¶ 12. As Mr. Zito explained in a June 2020 voicemail, to make the agreement appear legal, the money he was paying his competitor to stay out of the Montana and Wyoming markets "should probably include some sort of equipment, like a broken-down kettle in the yard or something that is just going to waste." *Id.* The defendant then produced a sham written agreement, styled as an Asset Sale and Option Agreement, that falsely stated that the money he was paying his competitor was for the purpose of acquiring construction equipment. *Id.*

The defendant's outreach to his competitor in South Dakota in 2020 was not the only time that he entered into or attempted to enter into an agreement that allocated crack sealing markets in Montana and Wyoming. *Id.* ¶ 13. In past years, he successfully entered into a market allocation agreement with a second competitor and attempted to enter into such an agreement with a third. *Id.*

## SENTENCING WITNESSES

The government does not anticipate testimony from any witnesses.

## ARGUMENT

**I.      Legal Standards**

The Court should impose a sentence sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also* 18 U.S.C. § 3553(a).  The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the advisory Guidelines.  *Id.*

After determining the appropriate advisory Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness considering the factors set out in Section 3553(a). *Id.* at 991-93. In arriving at the appropriate sentence for the defendant under Section 3553(a), the Court should consider these factors applicable to this case, among others:

  (1)     The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3) The need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4) The need for the sentence imposed to protect the public from further crimes of the defendant; and

(5) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## II. The Presentence Report Correctly Calculates the Guideline Range

The United States has no objection to the Probation Office's determination that the total offense level for the defendant's conduct is 10, which results in a guideline range of six to 12 months' imprisonment. The total offense level reflects a base offense level of 12, USSG §2R1.1(1), and a three-level increase for the conduct involving participation in an agreement to submit non-competitive bids, USSG §2R1.1(b)(1), and a volume of commerce of $2,700,000, USSG §2R1.1(b)(2)(A). The offense level was decreased by three levels because the defendant is charged with attempt to commit an underlying crime—monopolization—and two levels for acceptance of responsibility. USSG §§ 2X1.1(b)(1), 3E1.1(a).

The United States also believes that the $27,000 fine agreed to by the parties is appropriate.

### III. The 3553(a) Factors Weigh Heavily in Favor of a Term of Imprisonment

The United States recommends that the Court impose a sentence of imprisonment within the guideline range, three years of supervised release, and a $27,000 fine. The sentence is reasonable and not greater than necessary in light of the factors articulated in 18 U.S.C. § 3553. Several factors weigh in favor of a sentence of imprisonment: the need for the sentence to reflect the seriousness of the offense, the history and characteristics of the defendant, respect for the rule of law, the need for general and specific deterrence, and avoiding unwarranted sentencing disparities.

First, sentencing the defendant to a term of imprisonment is appropriate given the seriousness of his offense. 18 U.S.C. § 3553(a)(2)(A). Antitrust crimes are by nature serious offenses. As the Guidelines explain, "there is near universal agreement that restrictive agreements among competitors, such as . . . market-allocation, can cause serious economic harm," and, "[a]bsent adjustments, the guidelines require some period of confinement in the great majority of cases that are prosecuted." USSG § 2R1.1, Background. The Guidelines' "policy statements make plain that imprisonment is generally warranted for antitrust offenders." *United States v. Rattoballi*, 452 F.3d 127, 136 (2d Cir. 2006); *see also* USSG § 2R1.1, Cmt. n.5 ("It is

the intent of the Commission that alternatives such as community confinement not be used to avoid imprisonment of antitrust offenders."). The offense is particularly serious here because had the defendant succeeded in monopolizing the markets for highway crack sealing in Montana and Wyoming, the victims of the conspiracy would have been federal and state taxpayers who could have been forced to pay more for highway construction and maintenance projects.

Second, a sentence of imprisonment is supported by "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The defendant has been a successful asphalt and pavement contractor for several decades and, as the Presentence Investigation Report makes clear, he has profited significantly from his business. *See* PSR ¶ 51. He did not need to engage in this conduct, and he knew it was wrong. *See id.* ¶ 51 (describing the defendant's financial status). Over nearly 20 years, he has bid on dozens of projects administered by state departments of transportation, each of which required him or an agent of his company to attest that the submitted bid was the result of free and competitive bidding and not the product of collusion. Moreover, the defendant went to great lengths to conceal his actions, attempting to disguise the purpose and effect of his proposed market allocation agreement by concocting a sham asset transaction to make it appear legal.

Third, a sentence of imprisonment would "afford adequate deterrence to criminal conduct" by the defendant and other potential offenders and promote respect for the rule of law. *See* 18 U.S.C. § 3553(a)(2)(B). Bid-rigging and market allocation crimes are often difficult to detect and prosecute, particularly in consolidated markets like those at issue here. These crimes consist of secret agreements between individuals who are motivated to conceal their criminal activities. The difficulty in detecting these crimes is underscored by the fact that the defendant has entered into or attempted to enter into similar agreements on at least two occasions and took steps to disguise his misconduct in this case.

Deterrence is particularly important in the construction industry. Creating a competitive bidding process for federal and state transportation projects is important for minimizing costs associated with those projects and therefore obtaining the best value for taxpayers' money. Competitive bidding will be particularly important in coming years as billions of new dollars in federal infrastructure spending are allocated to the states. A substantial portion of that funding could be wasted if the punishment for engaging in illegal conduct is not substantial enough to outweigh the expected criminal rewards from collusive and fraudulent behavior. A significant prison sentence for the defendant here will help the United States deter construction

contractors from engaging in collusive conduct on federal and state infrastructure projects.

Finally, a sentence of imprisonment would serve "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Individuals like Mr. Zito routinely receive prison sentences for violations of federal antitrust laws. *See, e.g.,* Judgement, *U.S. v. Langan*, Case No. 3:20-CR-14 (D. Conn. Oct. 3, 2022) (sentencing defendant to a year and one day of imprisonment and a $150,000 fine); Judgment, *U.S. v. Aiyer*, Case No. 18-CR-333 (S.D.N.Y. Oct. 2, 2020) (sentencing defendant to eight months' imprisonment and $150,000 fine); Judgment, *U.S. v. Dip*, Case No. 18-CR-20877 (S.D. Fl. June 25, 2019) (sentencing defendants to 18 months' and 15 months' imprisonment and $20,000 fines each). Antitrust offenders have been sentenced to terms of imprisonment in cases where the volume of affected commerce was less than it is in this case and the defendant received a downward adjustment in his guidelines calculation for only playing a minor role in the offense. *See, e.g.*, Judgment, *U.S. v. Diaz*, Case No. 14-CR-00607 (N.D. Cal. March 13, 2017) (sentencing defendant to six months' imprisonment); Plea Agreement, *U.S. v. Diaz*, Case No. 14-CR-00607 (N.D. Cal. Nov. 16, 2016) (calculating guideline range for stipulated volume of commerce of $468,420).

As in those cases, a sentence of imprisonment would reflect the severity of the conduct and its harm to society.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court sentence the defendant to a term of imprisonment within the guideline range, three years of supervised release, and a $27,000 fine.

DATED this 10th day of February, 2023.

JESSE A. LASLOVICH
United States Attorney

*/s/ Bryan T. Dake*
BRYAN T. DAKE
Assistant U.S. Attorney

*/s/ Jeremy M. P. Goldstein*
JEREMY M. P. GOLDSTEIN
Trial Attorney